IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>XIAO CHENG MEI, aka Michael Mei,<br>Defendant. | Case No. 14-cr-00196-CRB-1<br><br>**ORDER RE SAFETY VALVE ELIGIBILITY** |

Defendant Michael Mei pled guilty to two counts of Manufacture and Possession With Intent to Distribute Marijuana in violation of 21 U.S.C. § 842(a)(1). See Criminal Minutes (dkt. 1433), Application (dkt. 1429). Each count carries a mandatory minimum sentence of five years. See 21 U.S.C. § 841(a)(1) and (b)(1)(B)(vii). In advance of his January 8, 2018 sentencing hearing, Mei asks the Court to rule on his safety valve eligibility. See generally Order Resetting Sentencing Hearing (dkt. 1911); Mei Mem. (dkt. 1894). Mei has offered to meet with the government to provide relevant information regarding his offense, pursuant to 18 U.S.C. § 3553(f)(5), but the government and the probation department have taken the position that Mei is ineligible for the safety valve because he "possess[ed] a firearm . . . in connection with the offense" pursuant to 18 U.S.C. § 3553(f)(2).[1] See Gov. Mem. at 3–5. The parties filed briefing on the issue and the Court held a status conference on November 15, 2017. See Mei Mem.; Gov. Mem.; Mei Reply (dkt. 1897); Gov. Reply (dkt. 1898); Status Conference (dkt. 1907). In the

---

[1] Accordingly, no proffer has taken place, although the government asserts that it will schedule one if the Court determines that Mei is otherwise eligible. Gov. Mem. (dkt. 1895) at 4 n.1.

course of the parties' briefing and at the status conference, three areas of disagreement arose, pertaining to (1) the applicable legal standard; (2) whether Mei has met his burden under that standard; and (3) the Second Amendment. The Court addresses those three subjects below, and in so doing concludes that Mei is ineligible for the safety valve.

### 1. The Applicable Legal Standard

Both sides agree that a defendant seeking the benefit of the safety valve bears the burden of demonstrating that he did not possess a firearm in connection with the offense. Where they differ is that Mei argues that he must do so "only by a preponderance of the evidence," while the government argues that a defendant must prove that it was "clearly improbable" that he possessed a firearm in connection with his offense. Mei Mem. at 2–3; Gov. Mem. at 5. Interestingly, both sides are able to cite to Ninth Circuit cases for their positions—but the case that the government relies on is itself based on error. In United States v. Fernandez, 526 F.3d 1247, 1252 (9th Cir. 2008), the case that the government relies on, the Ninth Circuit held that to establish safety valve eligibility, "'[t]he burden is on the defendant to prove that it was 'clearly improbable' that he possessed a firearm in connection with the offense.' United States v. Ferryman, 444 F.3d 1183, 1186 (9th Cir. 2006)." But that is not what Ferryman said.

Ferryman explained that "[t]o avoid an enhancement under U.S.S.G. § 2D1.1(b)(1), the burden is on the defendant to prove that it was "clearly improbable" that he possessed a firearm in connection with the offense. U.S.S.G. § 2D.1.1 cmt. 3." 444 F.3d at 1186 (emphasis added). But the court immediately drew a distinction between the standard for an enhancement and the standard for safety valve eligibility: "[t]o qualify for safety valve relief under U.S.S.G. § 5C1.2, the burden is also on the defendant to prove, but only by a preponderance of the evidence, that he did not possess a firearm in connection with the offense. See United States v. Nelson, 222 F.3d 545, 550 (9th Cir. 2000)." Id. (emphasis added). The court even reiterated: "The district court correctly held Ferryman to his burden of proving, by a preponderance of the evidence, that he did not possess the firearms in connection with the offense." Id. The government's argument in its reply brief that

2

Ferryman stands for anything other than applying the "preponderance of the evidence" standard to safety valve eligibility, because in a different section of the decision it cited to out-of-circuit authority and in those circuits there is a "clearly improbable" standard, is unpersuasive. See Gov. Reply at 5–7. The Court therefore concludes that "preponderance of the evidence" is the appropriate standard here—following Ferryman, not the Ninth Circuit's misquoting of Ferryman in Fernandez.[2]

### 2. Mei Has Not Met His Burden

Mei must therefore demonstrate by a preponderance of the evidence that he did not possess the firearm in connection with the offenses. Based upon the "circumstances in which the firearms were found, coupled with the implausibility of [his] explanations," Mei comes up short. See Ferryman, 444 F.3d at 1186.

### A. Circumstances and Explanations

FBI Special Agent Aram Crandall testified about the execution of the warrant on the Daly City property where Mei was arrested. Gov. Mem. at 7. He described searching the house and finding "a lot of electrical equipment, hoods, lamps" and "a lot of plants." Gov. Mem. Ex. 2 at 951. The plants were "marijuana in various stages of growth," from "baby plants" to "dried-out plants." Id. The plants were in agricultural beds, and "the rooms had . . . plants at various stages." Id. Crandall went on to describe the house as "just filthy; just a mess. There was mold and mildew. It was very damp. The rooms, themselves, were altered in a way, so as—they appeared destroyed, essentially, because of all the alterations to the rooms, and what-have-you." Id. He explained that there were "[e]lectrical holes cut out in doors and paneling. Sheeting on the walls. Equipment and lighting hanging from the ceiling. Light fixtures either removed or altered in some way, to

---

[2] The Court also notes that although Judge O'Scannlain authored the Fernandez decision in 2008, he was part of a panel in 2011 that concluded that a "district court erred in determining that [a defendant] was ineligible for safety-valve relief . . . because it applied a clearly improbable burden of proof." See United States v. Mah, No. 10-50568, 439 Fed. Appx. 653, at *1 (9th Cir. 2011) (citing Ferryman, 444 F.3d at 1186). The court in Mah vacated and remanded the case to the district court "to determine whether Mah can prove, by a preponderance of the evidence, that he qualifies for safety-valve relief." Id.

accommodate electrical equipment." Id. at 951–52. There were vents "all over the place." Id. at 954–55. Based on Crandall's testimony and the photographs of the house, the Court concludes that the house was a dedicated marijuana grow operation and was only minimally habitable.[3]

Mei was arrested in the bedroom on the lower level of the house. Id. at 952. No one else was in the house. Agents found a loaded Glock model 21 .45 caliber handgun on the bed, a magazine for a Glock loaded with ten rounds in the dresser drawer, and a Glock speed loader and box of Remington .22 caliber rounds in the same dresser. Gov. Mem. Exs. 7, 8. Other rooms involved in the marijuana grow were on the same level as the bedroom, including both rooms across the hallway—one contained a plant bed with a routing system for each marijuana plant, and the other contained "a bunch of electrical equipment, wires; just a confusing mess of electronics." Gov. Mem. Ex. 2 at 953–54, 956; Gov. Mem. Ex. 5 (floorplan); Gov. Mem. Ex. 6 (room G); Gov. Mem. Ex. 10 (room F). The Court concludes that Mei was occupying the premises primarily in order to operate the grow.

Mei submits a declaration stating that he resided at the house in Daly City, that he was cultivating marijuana on the top level but that his bedroom was on the lower level. Mei Decl. (dkt. 1894-1) at 1. He asserts that the gun was not possessed in connection with the marijuana grow, but that he carried it with him for personal safety. Id. at 1–2. Mei adds that he did not keep a gun at a second grow site that he was operating in Antioch, California. Id. at 2. The government submitted evidence of Mei stating in a conversation recorded in April 2012 that he had a habit of carrying a loaded gun with him always. Gov. Mem. at 11. In addition, at the status conference, Mei's counsel asserted that Mei obtained and registered the firearm in 2008, years before the March 2014 arrest at issue here—a fact that the Court acknowledged weighed in Mei's favor.

While Mei's suggestion that the grow operation was confined to the top level of the

---

[3] The living room and kitchen appeared to be used for living purposes. See Gov. Mem. Ex. 11 (room A); Gov. Mem. Ex. 12 (room M)

4

house is not accurate, the Court accepts Mei's representations that he obtained this gun years ago, that he did not keep a separate gun at the other grow site, that he had a habit of carrying the gun on his person, and that he possessed the gun at least in part out of a concern for his personal safety. What is not plausible is that the gun "had no relation to" the marijuana operation. See Mei Decl. at 1–2.

### B. Possession in Connection with the Offense

Mei's counsel argued emphatically at the status conference that possession of a gun is not enough—the gun must be possessed "in connection with" the offense. This is of course correct. See 18 U.S.C. § 3553(f)(2) ("defendant did not . . . possess a firearm . . . in connection with the offense."). But "in connection with" does not mean that the gun has to be used to commit the crime, as Mei's counsel insisted when he cited to Smith v. United States, 508 U.S. 223, 238 (1993) at the status conference. Smith did not involve the safety valve. The Court in that case was analyzing 18 U.S.C. § 924(c)'s requirement that, "during and in relation to any . . . drug trafficking crime," a gun be "use[d] or carrie[d]" or, "in furtherance of any such crime, possesse[d]." Id. at 237. The Court was not even discussing the carrying or possessing of a firearm, because the indictment in that case "alleged only that [the] petitioner 'use[d]' the [gun]." Id. at 228. The Court was therefore analyzing "use" of a firearm "in relation to" a drug trafficking crime, pursuant to 18 U.S.C. § 924(c). Id. at 237. In that context, the Court required that the gun have actually facilitated the crime—that it "have some purpose or effect with respect to the drug trafficking crime." See id. at 237–38. There is no such requirement in the context of the safety valve.

In creating the safety valve, Congress intended to "permit a narrow class of defendants, who are the least culpable participants in such offenses, to receive strictly regulated reductions in prison sentences for mitigating factors currently recognized under the federal sentencing guidelines." H.R. Rep. 103–460, 103d Cong., 2d Sess., 1994 WL 107571 (1994) ("Mandatory Minimum Sentencing Reform Act of 1994"). Mindful of the "narrow instances in which current mandatory minimum penalties should be eased,"

5

Congress established a "limited 'safety valve'" from mandatory minimum sentences for "the least culpable offenders." Id. The list of criteria that Congress included in defining the least culpable offenders reflects a concern about dangerousness. The offense must not have resulted in "death or serious bodily injury to any person," 18 U.S.C. § 3553(f)(3), the defendant cannot have used violence or threats of violence, 18 U.S.C. § 3553(f)(2), and the defendant cannot have possessed a firearm or other dangerous weapon in connection with the offense, id., because possession of such a weapon in connection with an offense indisputably adds to the dangerousness of the offense.

By possessing the gun while engaging in an illegal marijuana grow, Mei added to the dangerousness of the offense, taking him out of the narrow category of "least culpable participants" intended to benefit from the safety valve. He need not have used the gun to manufacture or possess the marijuana in the manner described in Smith (whatever that would look like). Even so, it is no great leap to conjecture that Mei's possession of the gun while engaging in the grow operation both emboldened him and protected the operation.

Mei's counsel also argued, and Mei declared, that Mei only had the gun for his personal safety. See Mei Mem. at 4 ("concern for personal safety rather than protection of a marijuana grow"); Mei Decl. at 2 ("I carried it with me, or in my vehicle, for personal safety."). But Mei's possessing the gun in connection with his personal safety does not preclude him from simultaneously possessing the gun to protect his marijuana operations, and himself as he tended to his marijuana operations. The two purposes are not mutually exclusive—indeed, Mei's involvement in the marijuana operation puts him at greater physical risk[4]—and Mei has not demonstrated that he could somehow separate one use

---

[4] In United States v. Jackson, 555 F.3d 635, 636 (7th Cir. 2009), Judge Easterbrook noted, in a case involving a Second Amendment challenge to 18 U.S.C. § 924(c), that the defendant's "problem is that he has repeatedly said that he possessed the gun to protect himself while at home—and it was from his home that he distributed illegal drugs. . . . Drug dealers are much more likely to be robbed by suppliers and customers than a household chosen at random is apt to be the subject of burglary, because the suppliers and customers know that the drug purveyor can't turn to the police for help; this makes dealers especially attractive targets." See also United States v. Eller, 670 F.3d 762, 766 (7th Cir. 2012) (discussing evidence "that drug traffickers are often subject to home invasion and robbery due to the value of their equipment and stash of drugs.") While an illegal marijuana grow is arguably less likely to be robbed than a dealer's house, as it is

6

from the other. Mei possessed the gun in the bedroom of his grow house, in close proximity to the grow operation. If someone were to break into the grow house and Mei to grab the gun, would he be grabbing it to protect himself as an individual, himself as operator of the grow, or the grow itself?

The Ninth Circuit recognized this issue in Ferryman, where the defendant had a grow operation within his family's home and argued that he possessed the firearms primarily for the protection of his family. 444 F.3d at 1185. The court noted that the "district court did not accept Ferryman's explanation that, although the marijuana operation probably enticed intruders into the home and endangered his family, he would have been able to determine when he should use firearms in defense of his family, in a way separate from defense of the marijuana growing operation." See 444 F.3d at 1186.

The same issue arose in Fernandez, where the defendant argued that he had not possessed the guns seized from his residence in connection with the underlying drug conspiracy, but "'simply to protect [his] residence and family.'" 526 F.3d at 1252. The district court there held that "even if Fernandez did not possess the weapons at the precise time and place of his alleged drug transactions, Fernandez failed to establish that, by storing the weapons in his home, he did not possess them in the 'conduct of the offense.'" Id. The district court noted that "Fernandez's concern for his family's protection itself stemmed from the dangers created by his involvement in a drug conspiracy." Id. The Ninth Circuit observed that "[w]hile Fernandez may simply have sought to overwhelm any would-be burglar in steadfast devotion to his kindred's welfare," the district court did not err in rejecting that explanation. Id.

Mei points to United States v. Boothroyd, 403 F. Supp. 2d 1011 (D. Or. 2005), as an example of a court accepting a defendant's explanation for a firearm's presence, and argues that "the evidence in support of [Mei's] eligibility for the safety valve is, if

---

less likely to be known by customers, it is nevertheless an illicit business whose purveyor cannot turn to the police for help. The Court observes that while Mei declares that "I had no reason to believe that the existence or location of the grows was known to anyone who I had reason to fear," Mei Decl. at 2, he does not declare that no one knew of its existence or location.

anything, clearer than the evidence in Boothroyd." Mei Mem. at 4. The comparison does not help Mei. In Boothroyd, the petitioner lived on "a remote, 107-acre parcel" in Oregon, where he raised cattle and kept horses, dogs, cats and chickens. 403 F. Supp. 2d at 1017. "There [was] a prevalence of cougars and coyotes in the area of petitioner's ranch." Id. The petitioner explained that he kept his rifle in his truck or in an outbuilding "for quick access to protect his livestock and property from predators and nuisance animals." Id. The only covered storage area that could fit the rifle was the cabinet next to the door of the grow operation. Id. And the rifle was "a hunting rifle, with a scope and special ammunition specifically designed for distance shooting." Id. Given those circumstances, the court found that the rifle was unrelated to the marijuana grow.[5]

Mei does not appear to have any family, cattle, or chickens to protect. There is no evidence in the record of cougars and coyotes prowling Daly City. His case has far more in common with Ferryman and Fernandez, where even a plausible explanation that the gun was for personal protection was not a plausible refutation that the gun was possessed in connection with an illegal marijuana grow.

Mei has not demonstrated by a preponderance of the evidence that he did not possess the gun in connection with his offense. Accordingly, he has not demonstrated that he is a member of the "narrow class" of "least culpable" defendants eligible for the safety valve. See 18 U.S.C. § 3553(f)(2); H.R. Rep. 103–460, 103d Cong., 2d Sess., 1994 WL 107571 (1994).

**3. Second Amendment**

At the status conference, Mei's counsel raised, briefly and for the first time, the Second Amendment.[6] He argued that excluding a defendant from the safety valve if the defendant merely possesses a gun—even if the gun is not directly involved in the

---

[5] The court in Boothroyd incorrectly relied on Smith in analyzing the firearm's role in the offense. See id. ("no evidence suggesting that petitioner's Marlin rifle 'facilitated' or had 'some purpose or effect' with respect to petitioner's charged criminal activity. Smith, 508 U.S. at 238, 113 S. Ct. 2050.")

[6] The parties have submitted no briefing on this subject.

8

marijuana grow—burdens the Second Amendment. This is a straw man argument. The Court does not hold that mere possession of a gun precludes Mei from the safety valve. Rather, as explained above, the Court holds that Mei failed to meet his burden in demonstrating that <u>the gun he possessed when he was arrested in the midst of his marijuana grow operation was not possessed in connection with his drug offense</u>, and, accordingly, he is ineligible for the safety valve. Mei can disagree with the Court about whether he has met his burden, but he cannot reasonably contend that it violates the Second Amendment to exclude a defendant from the safety valve if he possesses a gun in connection with his drug offense. To do so would be to misunderstand the Second Amendment.

The Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." <u>See</u> <u>District of Columbia v. Heller</u>, 554 U.S. 570, 635 (2008); <u>see also</u> <u>McDonald v. City of Chicago, Illinois</u>, 561 U.S. 742, 780 (2010) (central holding in <u>Heller</u> was "that the Second Amendment protects a personal right to keep and bear arms for lawful purposes"). It does "not protect the right of citizens to carry arms for <u>any sort</u> of confrontation, just as . . . the First Amendment [does not] protect the right of citizens to speak for <u>any purpose</u>." <u>Heller</u>, 554 U.S. at 595. The Supreme Court cautioned in <u>Heller</u> that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." <u>Id.</u> at 626–27.

On the basis of this language, courts have rejected Second Amendment challenges to sentencing enhancements based on the possession of firearms. <u>See, e.g.</u>, <u>United States v. Bryant</u>, 711 F.3d 364, 370 (2d Cir. 2013) ("the Second Amendment does not protect the <u>unlawful</u> purpose of possessing a firearm in furtherance of a drug trafficking crime and 18 U.S.C. § 924(c) as applied in this case does not violate the Second Amendment."); <u>United States v. Jacobson</u>, 406 Fed. Appx. 91, 93 (8th Cir. 2011) (collecting cases); <u>United States</u>

v. Riley, 359 Fed. Appx. 402, 404 (4th Cir. 2010) ("Heller had no effect on the Guidelines' directive to enhance a Guidelines range if a weapon was present during the commission of a crime."); United States v. Goodlow, 389 Fed. Appx. 961, 967–69 (11th Cir. 2010) ("no support in Heller for the invalidation of the firearm enhancement on the basis of the Second Amendment."); Costigan v. Yost, 334 Fed. Appx. 460, 462 (3d Cir. 2009) (conviction for possession of firearm during crime of violence not invalidated by Heller). In one such case, the Ninth Circuit explained, "it cannot seriously be contended that the Second Amendment guarantees a right to use a firearm in furtherance of drug trafficking." See United States v. Potter, 630 F.3d 1260, 1261 (9th Cir. 2011); see also United States v. Palumbo, 468 Fed. Appx. 751, 752 (9th Cir. 2012) ("There is no constitutional right to possess a gun for unlawful purposes."). Because "the furtherance of drug trafficking is not a lawful purpose," the Ninth Circuit found 18 U.S.C. § 924(c) constitutional post-Heller, adding that "[e]ven if [the defendant] kept the firearm also to protect himself and his home, he committed a crime because he possessed the firearm in furtherance of drug trafficking." Potter, 630 F.3d at 1261.

Possessing a firearm in connection with drug trafficking is also not a lawful purpose. See Jacobson, 406 Fed. Appx. at 92–93 (rejecting Second Amendment challenge to safety valve on same basis). Put another way, Mei cannot actually be arguing that denying defendants the safety valve burdens the Second Amendment, because defendants have no Second Amendment right to the safety valve. Perhaps he means that defendants using firearms in defense of hearth and home will be unfairly denied the safety valve and thereby subjected to longer sentences—a punishment for exercising their Second Amendment rights. Or else he means that defendants, knowing that they are at risk of safety valve ineligibility, will refrain from using firearms in defense of hearth and home, even though that right is protected by the Second Amendment. Both arguments miss the central requirement of a lawful purpose.

The safety valve does not prevent defendants from lawfully possessing firearms. For example, although the court in Boothroyd did not address the Second Amendment, it is

implicit in the court's discussion that the petitioner possessed his rifle for a lawful purpose: fending off predators. See 403 F. Supp. 2d at 1017. The petitioner in Boothroyd was therefore eligible for the safety valve. Id. Unlike the petitioner in Boothroyd, Mei has failed to demonstrate that he did <u>not</u> possess the firearm in connection with his drug offenses. Individuals have no Second Amendment right to possess a firearm in connection with drug offenses. See, e.g., Jackson, 555 F.3d at 636 ("The Constitution does not give anyone the right to be armed while committing a felony, or even to have guns in the next room for emergency use should suppliers, customers, or the police threaten a dealer's stash."); Bryant, 711 F.3d at 370 ("once [the defendant] engaged in an illegal home business . . . he was no longer a law-abiding citizen using his firearm for a lawful purpose") (internal quotation marks and citation omitted). Accordingly, the safety valve does not burden Mei's Second Amendment rights.[7]

For the foregoing reasons, the Court holds that Mei is ineligible for the safety valve.

**IT IS SO ORDERED.**

Dated: December 1, 2017

CHARLES R. BREYER
United States District Judge

---

[7] Because the Court finds that there is no burden on Mei's Second Amendment rights, it does not continue on to the second step of the two-step inquiry discussed in Silvester v. Harris, 843 F.3d 816, 820–21 (9th Cir. 2016) ("first, the court asks whether the challenged law burdens conduct protected by the Second Amendment; and if so, the court must then apply the appropriate level of scrutiny."). However, even if the safety valve provision <u>does</u> impose some burden on Mei's Second Amendment rights, the Court would hold that the safety valve survives intermediate scrutiny, see id. at 821 (intermediate scrutiny applies if law does not both implicate core right and severely burden that right), as the government's purpose of reducing violence is significant, substantial and important, and there is a "reasonable fit" between the safety valve and that purpose, see id. at 821–22.